**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALEXANDER CLIFFORD, individually and on behalf of all others similarly situated, | |
| Plaintiff, | No. _____ |
| v. | **JURY DEMANDED** |
| STATUS RESEARCH & DEVELOPMENT GMBH, JARRAD HOPE, and CARL BENNETTS, | |
| Defendants. | |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff Alexander Clifford, individually and on behalf of all others similarly situated, brings this action against Defendants Status Research & Development GmbH ("Status"), Jarrad Hope, and Carl Bennetts. Plaintiff's allegations are based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of relevant whitepapers, press releases, media reports, and other publicly disclosed reports and information about Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein, after a reasonable opportunity for discovery. Plaintiff hereby alleges as follows:

## I.  INTRODUCTION

1.      Within the Class Period, which is from June 20, 2017 through the present, Status and individual defendants Jarrad Hope and Carl Bennetts (the "Individual Defendants") promoted, offered, and sold Status's securities, called SNT tokens, throughout the United States, in violation of federal and state securities laws. Plaintiff individually and on behalf of investors who purchased SNT tokens in the United States (the "Class") brings claims to recover the consideration paid for the SNT tokens, together with interest thereon, as well as attorneys' fees and costs.

2.      A digital token is a type of digital asset that exists on what is called a "blockchain," which is essentially a decentralized digital ledger that records transactions. Various digital assets can reside on blockchains, including cryptocurrencies, such as Bitcoin and Ethereum (both discussed in greater detail below), as well as so-called "smart contracts" that operate under a set of predetermined conditions agreed to by users. With smart contracts, the terms of the contract are automatically carried out by the software underlying the digital tokens (which, as relevant here, are referred to as "ERC-20 tokens" and exist on the Ethereum blockchain) when the agreed conditions are met.

2

3.      Certain of these digital tokens are classified as "utility tokens" and are associated with particular projects.  Their primary purpose is to allow the holder to use or access the associated project.   For example, one private-jet company issues utility tokens to participants in its membership program, who can then use them to charter flights on the company's planes.  A utility token presumes a functional network on which the token can be used.

4.      Other tokens are more speculative and are referred to as "security tokens," and like a traditional security essentially represent one's investment in a project.  Although they take value from the startup behind the project, they do not give the holder ownership in that startup.  Rather, investors purchase these tokens with the idea that their value will increase as the network in which the token can be used is expanded based upon the managerial efforts of the issuer and those developing the project.  Because such "security tokens" are properly classified as securities under federal and state law, the issuers of these tokens, including Status, were required to file registration statements with the U.S. Securities and Exchange Commission ("SEC").  Status, however, failed to do so.  By selling these unregistered tokens to investors, Status reaped millions of dollars in profits.

5.      The scheme worked as follows:  First, Status issued a "whitepaper" to investors that described in highly technical terms the supposed utility to which SNT would be placed.  The Status whitepaper, however, omitted the disclosures that securities laws and the SEC have long deemed essential to investor protections in initial public offerings, including use of "plain English" to describe the offering; a required list of key risk factors; a description of key information and incentives concerning management; warnings about relying on forward-looking statements; and a standardized format that investors could readily follow.   Without these critical disclosures,

investors in SNT tokens were thus left to fend for themselves—precisely the opposite of what the securities laws require.

6.      Status then sold the SNT tokens to investors through an "initial coin offering" (or "ICO"). SNT kept 20 percent of the SNT tokens for itself and solicited online exchanges of digital assets (known as "cryptocurrency exchanges") to list SNT tokens on their platforms and encourage purchases by a wide universe of investors. Although SNT was a security, the Status whitepaper was notably silent as to whether SNT was a security, and Status did not register it as a security with the SEC and did not qualify for an exemption from registration requirements.

7.      Status did not disclose at issuance that SNT was a security. In fact, the Status whitepaper described SNT as a "utility network token," and misleadingly stated that SNT "fit[s] within regulatory parameters in any new market we enter." Investors thus reasonably understood that SNT was not subject, at issuance, to U.S. securities laws. In addition, Status further confirmed to investors at issuance that SNT was not a security by failing to file a registration statement for it with the SEC.

8.      Status promoted, offered, and sold SNT through generalized solicitations using statements posted on the Internet and distributed throughout the United States and the rest of the world, such that Status offered and sold the securities to Plaintiff and the general public in the United States. Although Status suggested that the SNT tokens were something other than securities, they were securities. This was not clear to a reasonable investor at purchase, however, and would not have been reasonably apparent until, at the earliest, April 3, 2019, when the SEC released a detailed "Framework" to analyze digital assets, indicating that SNT and other similar digital tokens are "investment contracts" and therefore securities under Section 2 of the Securities

Act of 1933 (the "Securities Act"), 15 U.S.C. § 77b(a)(1).[1]  Prior to that time, based on statements of Status and the SEC, a reasonable investor would not have concluded that such tokens were securities under federal and state law.  But SNT *was* a security under the SEC Framework.  Status thus engaged in transactions that consisted of the solicitation, offer, and sale of securities without registering them as federal and state laws require for the protection of investors.

9.      On September 30, 2019, nearly six months after releasing its Framework, the SEC found that another major issuer of digital tokens, Block.one, which had issued a token called EOS between June 2017 and June 2018, had likewise violated the Securities Act by selling unregistered securities to the public.  The EOS token was functionally identical to SNT—both tokens were not described as securities to investors, but are securities under the SEC's Framework.  As a result of an SEC enforcement action, Block.one was required to pay a $24 million fine.[2]  The SEC's determination that EOS is a security applies with equal force to SNT.

10.      Plaintiff and the Class are entitled to recover the consideration paid for the SNT tokens with interest thereon at the legal rate, or the equivalent in monetary damages plus interest at the legal rate from the date of purchase.

11.      In addition, numerous Class members resided, and were present at the time they traded in SNT tokens, in the State of Illinois, which provides its own "Blue Sky" protections for

---

[1] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets#_ednref1.

[2] Press Release, *SEC Orders Blockchain Company to Pay $24 Million Penalty for Unregistered ICO* (Sept. 30, 2019), https://www.sec.gov/news/press-release/2019-202; Block.one, Exchange Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

investors.[3]  Under these laws, investors in Illinois who purchased unregistered SNT securities are entitled to rescission, as well as interest thereon, attorneys' fees, and costs.

12.     Accordingly, Plaintiff individually and on behalf of the Class brings claims to recover the consideration paid for the SNT tokens, together with interest thereon, as well as attorneys' fees and costs.

## II.  PARTIES

### A.  Plaintiff

13.     Plaintiff Alexander Clifford is a resident of Chicago, Illinois.  Clifford and members of the Class purchased SNT, an unregistered security, from Illinois during the Class Period.

### B.  Defendants

14.     Defendant Status is an entity formed under the laws of Switzerland with headquarters in Zug, Switzerland.  Status is the developer of an open source messaging platform and mobile interface to interact with decentralized applications that run on the Ethereum Network.

15.     Defendant Jarrad Hope is a co-founder of Status and the CEO of Status.  On information and belief, he resides in Zug, Switzerland.

16.     Defendant Carl Bennetts is a co-founder of Status and the Chief Communications Officer ("CCO") of Status.  On information and belief, he resides in Zug, Switzerland.

---

[3] These "Blue Sky" statutes are so named because they are designed to protect investors from "speculative schemes which have no more basis than so many feet of blue sky."  *Hall v. Geiger-Jones Co.*, 242 U.S. 539, 550 (1917) (internal citations omitted).  Like the federal securities laws, Illinois defines "securities" to include "investment contracts," which has been interpreted by Illinois courts at least as broadly as the standard set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946).

### III.   JURISDICTION AND VENUE

17.     Jurisdiction of this Court is founded upon 28 U.S.C. § 1331 because the Complaint asserts claims under Sections 5, 12(a)(1), and 15 of the Securities Act, 15 U.S.C. §§ 77e, 77*l*(a)(1), 77o.  This Court further has jurisdiction over the Securities Act claims pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v.

18.     This Court has jurisdiction over the statutory claims of violations under 815 Ill. Comp. Stat. Ann. 5/13 pursuant to this Court's supplemental jurisdiction under 28 U.S.C. §1367(a).

19.     This Court has personal jurisdiction over Defendants as a result of acts of Defendants occurring in or aimed at the State of New York in connection with Defendants' offer or sale of unregistered securities.

20.     Venue is proper pursuant to 15 U.S.C. § 77v(a) in that this is a district wherein one or more defendants is found or transacts business and where the offer or sale of SNT tokens took place.  For example, Status was represented at the 2019 Blockchain Week New York conference, which held numerous events in this district.  Status has additionally advertised software design job openings in this district.  And on February 18, 2020, Status hosted a product "Launch Party" in New York City that, on information and belief, was attended by residents of this district.

### IV.   FACTUAL ALLEGATIONS

#### A.   The First Cryptocurrency: Bitcoin

21.     A cryptocurrency is a digital asset designed to work as a medium of exchange or a store of value or both.  Cryptocurrencies leverage a variety of cryptographic principles to secure transactions, control the creation of additional units, and verify the transfer of the underlying digital assets.

22.     Bitcoin was the world's first decentralized cryptocurrency.  It is also the largest and most popular cryptocurrency, with a market capitalization of approximately $126 billion.  Bitcoin spawned a market of other cryptocurrencies that, together with Bitcoin, have a current market capitalization of approximately $192 billion.  (The term "bitcoin" can refer to both a computer protocol and a unit of exchange.  Accepted practice is to use the term "Bitcoin" to label the protocol and software, and the term "bitcoin" to label the units of exchange.)

23.     At its core, Bitcoin is a ledger that tracks the ownership and transfer of every bitcoin in existence.  This ledger is called the blockchain.

24.     Blockchains act as the central technical commonality across most cryptocurrencies. While each blockchain may be subject to different technical rules and permissions based on the preferences of its creators, they are typically designed to achieve the similar goal of decentralization.

25.     Accordingly, blockchains are generally designed as a framework of incentives that encourages some people to do the work of validating transactions while allowing others to take advantage of the network.  In order to ensure successful validation, those completing the validation are also required to solve a "Proof of Work" problem by expending computational resources, which has the effect of making the blockchain more accurate and secure.  For Bitcoin, those who validate the blockchain transactions and solve the "Proof of Work" program are rewarded with newly minted bitcoin.  This process is colloquially referred to as "mining."

26.     Mining is one method by which an individual can acquire cryptocurrencies like Bitcoin.  A second and more common manner is to obtain cryptocurrencies from someone else.  This is often accomplished by acquiring it through an online "cryptocurrency exchange." Online cryptocurrency exchanges are one place to purchase Bitcoin and other cryptocurrencies.

These exchanges are similar to traditional exchanges in that they provide a convenient marketplace to match buyers and sellers of virtual currencies.

27.     In April 2013, there were only seven cryptocurrencies listed on coinmartketcap.com, a popular website that tracks the cryptocurrency markets.  As of this filing, the site monitors more than 2,000 cryptocurrencies.

28.     For a time, Bitcoin was the only cryptocurrency available on exchanges.  As cryptocurrencies grew in popularity, exchanges began listing other cryptocurrencies as well, and trading volumes expanded.  In early 2013, daily Bitcoin trading volumes hovered between $1 million and $25 million.  By the end of 2017, daily Bitcoin trading volumes ranged between $200 million and $3.8 billion.

**B.  Ethereum**

29.     Ethereum is the second-most popular cryptocurrency, with a market capitalization of approximately $16 billion.  The Ethereum blockchain functions similarly to the Bitcoin blockchain insofar as its miners act as the validators of the network.  Miners of the Ethereum blockchain are paid for their services in the form of newly minted ether.  (The term "Ethereum" refers to the open software platform built on top of the Ethereum blockchain, while the term "ether" is the unit of account used to exchange value within the Ethereum "ecosystem," *i.e.*, the overall network of individuals using Ethereum or participating in the development of its network.)

30.     Unlike Bitcoin's blockchain, Ethereum was designed to enable "smart contract" functionality.  A smart contract is a program that verifies and enforces the negotiation or performance of a contract.  Smart contracts can be self-executing and self-enforcing, which theoretically reduces the transaction costs associated with traditional contracting.

31.     As an example of how a smart contract works, consider a situation where two people want to execute a hedging contract.  They each put up $1,000 worth of ether.  They agree

that, after a month, one of them will receive back $1,000 worth of ether at the dollar exchange rate at that time, while the other receives the rest of the ether.  The rest of the ether may or may not be worth more than it was at the beginning of the month.

32.     A smart contract enables these two people to submit the ether to a secure destination and automatically distribute the ether at the end of the month without any third-party action.  The smart contract self-executes with instructions written in its code which get executed when the specified conditions are met.

33.     In order to enable widespread adoption and standardized protocols for smart contracts, the Ethereum community has created certain out-of-the box smart contracts called Ethereum Request for Comments ("ERCs").

34.     An ERC is an application standard for a smart contract.  Anyone can create an ERC and then seek support for that standard.  Once an ERC is accepted by the Ethereum community, it benefits Ethereum users because it provides for uniform transactions, reduced risk, and efficient processes.  The most widespread use of ERCs is to allow individuals to easily launch and create new digital tokens.

**C.  ERC-20 Tokens**

35.     ERC-20 is a standardized application standard that the creator of Ethereum, Vitalik Buterin, first proposed in 2015.  ERC-20 is a standard that allows for the creation of smart-contract tokens on the Ethereum blockchain, known as "ERC-20 tokens."

36.     ERC-20 tokens are built on the Ethereum blockchain, and therefore they must be exchanged on it.  Accordingly, ERC-20 tokens are functionally different than cryptocurrencies like Bitcoin and Ethereum because they do not operate on an independent blockchain.

37.     ERC-20 tokens all function similarly by design—that is, they are compliant with the ERC-20 application standard.  Some properties related to ERC-20 tokens are customizable,

such as the total supply of tokens, the token's ticker symbol, and the token's name.  All ERC-20 tokens transactions, however, occur over the Ethereum blockchain; none of them operates over its own blockchain.

38.     ERC-20 tokens are simple and easy to deploy.  Anyone with a basic understanding of Ethereum can use the ERC-20 protocol to create her own ERC-20 tokens, which she can then distribute and make available for purchase.  Even people without any technical expertise can have their own ERC-20 token created for them, which can then be marketed to investors.

**D.  The Advent Of The "ICO"**

39.     Between 2014 and 2016, Bitcoin's price fluctuated between $200 and $800.  During this same time frame, ether's price fluctuated between roughly $1 and $10.

40.     By the end of 2016, interest in cryptocurrencies began to accelerate, with prices growing at a rate historically unprecedented for any asset class.  Over the course of 2017 alone, bitcoin's price increased from approximately $1,000 to approximately $20,000.  Ethereum's growth was even more startling.  On January 1, 2017, Ethereum was trading at approximately $8 per ether.  Approximately one year later, it was trading at over $1,400 per ether—a return of approximately 17,000 percent over that period.

41.     Seeking to capitalize on the growing enthusiasm for cryptocurrencies, many entrepreneurs sought to raise funds through initial coin offerings, or ICOs, including ICOs for newly created ERC-20 tokens, such as the SNT tokens.  Many of these issuers improperly chose not to register their securities offerings with the SEC in order to save money and not "open their books" to the SEC, even though investors thereby were denied access to critical information they would have received from an SEC-registered offering.  As a result, investors, including investors in SNT, were denied access to important information before making their investment decision.

11

42.     In the case of SNT, the initial offering occurred over an approximately twenty-four-hour period, with 100 percent of the available supply of SNT tokens sold, raising approximately $100 million.

43.     Investors would explore the various cryptocurrency exchanges and social media sites that published active and upcoming ICOs.  Many of these postings encouraged trading in SNT for profit.  As one poster explained:  "On paper, [SNT] has some substance that most other ICOs lack . . . Potential short-term ROI is appealing, but it's something that I might consider [holding] long-term."

44.     Over 2017 and 2018, nearly $20 billion was raised through ICOs, none of which was registered with the SEC.  Of the approximately 800 ICOs launched between 2017 and 2018, the vast majority were issued using the ERC-20 protocol.

45.     Like most ICOs, ERC-20 ICOs were typically announced and promoted through public online channels.  Issuers, including Status, typically released a "whitepaper" describing the project and terms of the ICO.  These whitepapers advertised the sale of tokens or coins through the ICO.  They typically advertised the creation of a "new blockchain architecture."

46.     The whitepapers typically contained vastly less information than a registration statement filed with the SEC would have included.  For example, whitepapers often did not include a "plain English" description of the offering; a list of key risk factors; a description of important information and incentives concerning management; warnings about relying on forward-looking statements; or a standardized format that investors could readily follow.

47.     When tokens were sold through an ERC-20 ICO, the issuer usually asserted that such tokens entitled their holders to certain rights related to a venture underlying the ICO, such as the right to use certain services provided by the issuer.  In almost all cases, these tokens could also

12

be traded, thereby giving investors a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others (that is, the people operating the issuer whose efforts will impact the value of those tokens on the secondary market).

48.     These tokens were frequently listed on cryptocurrency exchanges, where they were bought and sold using other cryptocurrencies (such as Bitcoin or Ethereum) or traditional currencies such as the U.S. dollar.

**E.  Status Solicited And Sold The SNT Token Through Both An ICO And Through Subsequent Sales On Cryptocurrency Exchanges**

49.     In June 2017, Status published a whitepaper for "The Status Network." Casting the Status platform as "a window into the emerging decentralized web," the whitepaper described the platform as an "ecosystem of decentralized applications" that would "become[] a gateway to undeniable free trade, peer-to-peer payments, and encrypted p2p communication for anyone with a smartphone and internet access." The whitepaper asserted that, through SNT, Status would "allow[] the behavior of the network and its software[] to become aligned with the interests of its Users," enabling users "to steer the direction of development and influence how the network evolves over time."

50.     SNT was launched through use of the ERC-20 protocol. At launch, approximately 3 billion tokens were made available for purchase through use of the ERC-20 protocol.

51.     Status retained approximately 20 percent of those tokens. Status held "up to 10%" of the tokens for a group Status described as "our community members and contributors who . . . have supported us over the past 12 months . . . ." Status held 29 percent of the tokens in reserve for future fundraising efforts.

52.     The remaining 41 percent of the tokens were sold during SNT's ICO, which Status organized and ran.  Over its twenty-four-hour ICO, from June 20 to June 21, 2017, Status raised approximately $100 million in proceeds.

53.     The Status ICO was promoted on unregistered cryptocurrency exchanges:



54.     Status promoted and advertised SNT tokens in the United States.  For example, Status was represented at the 2019 Blockchain Week New York conference, which held numerous events in this district.  And on February 18, 2020, for example, Status hosted a product "Launch Party" in New York City that, on information and belief, was attended by residents of this district.

**F.  Investors Would Not Reasonably Have Understood Prior To April 3, 2019, At The Earliest, That SNT Was A Security**

55.     Status made statements that would have led a reasonable investor to conclude that the tokens sold in its ICO were not securities.

56.     The Status whitepaper assured potential investors that it "fit within regulatory parameters in any new market we enter," yet failed to register its offering of SNT with the SEC, thus further confirming to investors that SNT was not a security.

57.     Misleadingly, Status also promoted itself as being similar to Bitcoin, which is not a security nor required to be registered with the SEC.  The Status whitepaper asserted, for example, that SNT was "[i]nspired by one of Satoshi Nakamoto's original suggested use cases for Bitcoin"; "organized around smart contracts running on Ethereum"; "the first ever mobile Ethereum client," which "connects directly to the Ethereum network"; and that "Status and Ethereum provide the foundation necessary to give all stakeholders in a socioeconomic network equal footing."

58.     At the time of the SNT ICO, Status took advantage of the market's lack of understanding and awareness concerning how cryptocurrencies worked.  In the face of suggestions that SNT would be similar to Bitcoin, and considering the new technology at issue and Status's other statements, many investors were understandably unaware that SNT tokens had fundamentally different features than other cryptocurrencies, which the SEC has determined are not securities.  Prior to April 3, 2019, when the SEC released its Framework, it was therefore unclear to a reasonable investor that SNT was a security.

59.     On June 14, 2018, the Director of the Corporation Finance Division, William H. Hinman, explained that "the ICOs I am seeing, strictly speaking, the token—or coin or whatever the digital information packet is called—all by itself is not a security."  On May 2, 2018, Commissioner Hester Peirce similarly expressed her view that not "all ICOs must be deemed securities offerings."  Commissioner Peirce identified numerous open questions that issuers like Status emphasized when arguing ERC-20 tokens are not securities, such as the utility of the SNT token in an incomplete or partially complete network.

60.    Other thought leaders in the space, such as the lawfully registered broker-dealer Coinbase, opined in late 2016 that "we have considered the question of whether issuance of a Blockchain Token prior to the existence of a system would constitute a security.  We have not found conclusive law on the subject, but believe that the better view is that a non-security Blockchain Token does not become a security merely because the system as to which it has rights has not yet been created or completed."

61.    In sum, before the SEC issued its Framework on April 3, 2019, a reasonable investor would not have concluded that ERC-20 tokens like the SNT token were generally securities subject to the securities laws.  On the contrary, they were confronted with representations both from token issuers and from cryptocurrency discussions that would have led reasonable investors to conclude they were not investing in securities.  And the Status whitepaper said nothing about the issue whatsoever.

### G.  The SNT Tokens Are Securities

62.    SNT tokens are securities because they constituted an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. At issuance, as described above, it was not clear that the SNT tokens were securities as defined under federal and state securities laws.  Status acted as if the SNT tokens were *not* securities, for example, by not ensuring that a registration statement was filed with the SEC, which would have provided important disclosures to investors of the risks inherent in these investments, including their speculative nature.

63.    Moreover, Status misleadingly compared SNT to Bitcoin in its whitepaper.  The distinction between Bitcoin and Ethereum, on the one hand, and digital tokens, such as SNT, on the other, was material to investors, including in evaluating whether SNT is a security.  When the Bitcoin and Ethereum systems were created, only a tiny fraction of the underlying cryptocurrency

16

units was in existence.  As a result, increases in bitcoin and ether could occur at a fixed rate over time, such as from mining.  The growth of Bitcoin and Ethereum thus occurs through a decentralized process as numerous users engage in mining and other efforts to build the ecosystem.

64.     By contrast, Status issued a substantial portion of the total stock of SNT tokens at issuance, at very little economic cost to Status's founders.  The creation of SNT tokens thus occurred through a *centralized* process, in contrast to Bitcoin and Ethereum.  This would not have been apparent at issuance, however, to a reasonable investor.  Rather, it was only after the passage of time and disclosure of additional information about the issuer's intent, process of management, and success in allowing decentralization to arise that a reasonable purchaser could know that he or she had acquired a security.  Purchasers were thereby misled into believing that SNT was something other than a security, when it *was* a security.

65.     Within the last year, however, the SEC has clarified, pursuant to its statutorily delegated authority, and with the benefit of labor-intensive research and investigations, that many ERC-20 tokens, including SNT, are securities.  On April 3, 2019, as noted, the SEC published a "Framework for 'Investment Contract' Analysis of Digital Assets," in which it "provided a framework for analyzing whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions."  Among the most significant statements therein is the SEC's description of how to analyze the various facts surrounding ICOs in determining whether a given digital asset, like SNT, is a security.  Under application of the Framework, the SNT tokens were securities at issuance.

66.     In the Framework, the SEC cautioned potential issuers:  "If you are considering an Initial Coin Offering, sometimes referred to as an 'ICO,' or otherwise engaging in the offer, sale,

or distribution of a digital asset, you need to consider whether the U.S. federal securities laws apply."  The SEC explained the basics of the *Howey* test:

> The U.S. Supreme Court's *Howey* case and subsequent case law have found that an "investment contract" exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. The so-called "*Howey* test" applies to any contract, scheme, or transaction, regardless of whether it has any of the characteristics of typical securities. The focus of the *Howey* analysis is not only on the form and terms of the instrument itself (in this case, the digital asset) but also on the circumstances surrounding the digital asset and the manner in which it is offered, sold, or resold (which includes secondary market sales). Therefore, issuers and other persons and entities engaged in the marketing, offer, sale, resale, or distribution of any digital asset will need to analyze the relevant transactions to determine if the federal securities laws apply.

Investors who bought SNT tokens invested money or other valuable consideration, such as bitcoin and ether, in a common enterprise—Status.  Investors had a reasonable expectation of profit based upon Status's efforts, including, among other things, Status obtaining listing of SNT tokens on various cryptocurrency exchanges.

### a.   SNT Token Purchasers Invested Money

67.    Investors in SNT tokens made an investment of money or other valuable consideration for purposes of *Howey*.  The SEC Framework states:  "The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of traditional (or fiat) currency, another digital asset, or other type of consideration."

68.    Investors invested traditional and other digital currencies, such as bitcoin and ether, to purchase the SNT tokens.  SNT tokens were listed on many cryptocurrency exchanges, and those cryptocurrency exchanges permitted investors to purchase SNT with bitcoin and ether.

b.     **SNT Token Investors Participated In A Common Enterprise**

69.     The SEC Framework states:  "In evaluating digital assets, we have found that a 'common enterprise' typically exists."  This is "because the fortunes of digital asset purchasers have been linked to each other or to the success of the promoter's efforts."

70.     The SNT tokens are no different.  Investors were passive participants in the SNT token ICO and the profits of each investor were intertwined with those of both Status and of other investors.  Status was responsible for supporting SNT, pooled investors' assets, and controlled those assets.  Status also retained a significant stake in SNT, thus sharing in the profits and risk of the venture.

71.     To this effect, Status asserted that its governance structure "empower[ed] stakeholders in the Status Network" by giving them rights akin to holders of voting stock in a corporation.  The whitepaper asserted that "[a] core part of the Status Network Token is giving stakeholders the ability to choose the direction that the software is developed.  The token is used to make decisions on proposals, which can be made by any Stakeholder. . . .  The amount of tokens you hold at that time becomes your voting power for that decision."  Accordingly, investors in SNT participated in a common enterprise by purchasing the token.

c.     **SNT Token Investors Purchased The Tokens With A Reasonable Expectation Of Profit From Owning Them**

72.     As to "reasonable expectation of profits," the SEC Framework states:  "A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market."

73.     Investors in the SNT tokens, including Plaintiff and the Class, made their investment with a reasonable expectation of profits.  The SNT token was sold to investors prior to a network or "ecosystem" on which it could be used being fully developed.  For pre-functional

tokens, such as SNT, the primary purpose for purchasing the token was to make a profit, rather than to utilize the token itself for a task.

74.     Alluding to the "AP" (the "Active Participant"), which is the promoter, sponsor, or other third party that "provides essential managerial efforts that affect the success of the enterprise," the Framework identifies a series of factually intense questions underscoring both the time the SEC had spent considering these issues and the challenges a layperson would face in analyzing whether a digital asset constitutes a security.  In particular, the Framework lays out a number of characteristics to assess whether the "reasonable expectation of profits" element is met with respect to whether digital assets (such as SNT) thereby satisfy the *Howey* test:

> The more the following characteristics are present, the more likely it is that there is a reasonable expectation of profit:
>
> - The digital asset gives the holder rights to share in the enterprise's income or profits or to realize gain from capital appreciation of the digital asset.
>   - The opportunity may result from appreciation in the value of the digital asset that comes, at least in part, from the operation, promotion, improvement, or other positive developments in the network, particularly if there is a secondary trading market that enables digital asset holders to resell their digital assets and realize gains.
>   - This also can be the case where the digital asset gives the holder rights to dividends or distributions.
> - The digital asset is transferable or traded on or through a secondary market or platform, or is expected to be in the future.
> - Purchasers reasonably would expect that an AP's efforts will result in capital appreciation of the digital asset and therefore be able to earn a return on their purchase.
> - The digital asset is offered broadly to potential purchasers as compared to being targeted to expected users of the goods or services or those who have a need for the functionality of the network.
>   - The digital asset is offered and purchased in quantities indicative of investment intent instead of quantities indicative of a user of the network.  For example, it is offered and purchased in quantities significantly greater than any likely user would reasonably need, or so small as to make actual use of the asset in the network impractical.

20

- There is little apparent correlation between the purchase/offering price of the digital asset and the market price of the particular goods or services that can be acquired in exchange for the digital asset.

- There is little apparent correlation between quantities the digital asset typically trades in (or the amounts that purchasers typically purchase) and the amount of the underlying goods or services a typical consumer would purchase for use or consumption.

- The AP has raised an amount of funds in excess of what may be needed to establish a functional network or digital asset.

- The AP is able to benefit from its efforts as a result of holding the same class of digital assets as those being distributed to the public.

- The AP continues to expend funds from proceeds or operations to enhance the functionality or value of the network or digital asset.

- The digital asset is marketed, directly or indirectly, using any of the following:

  o The expertise of an AP or its ability to build or grow the value of the network or digital asset.

  o The digital asset is marketed in terms that indicate it is an investment or that the solicited holders are investors.

  o The intended use of the proceeds from the sale of the digital asset is to develop the network or digital asset.

  o The future (and not present) functionality of the network or digital asset, and the prospect that an AP will deliver that functionality.

  o The promise (implied or explicit) to build a business or operation as opposed to delivering currently available goods or services for use on an existing network.

  o The ready transferability of the digital asset is a key selling feature.

  o The potential profitability of the operations of the network, or the potential appreciation in the value of the digital asset, is emphasized in marketing or other promotional materials.

  o The availability of a market for the trading of the digital asset, particularly where the AP implicitly or explicitly promises to create or otherwise support a trading market for the digital asset.

75.    The SEC Framework clarifies that investors purchased the SNT tokens with a reasonable expectation of profits.

76.    The Status whitepaper asserted, as examples, that "the Status mobile Ethereum client" was "well suited for mass adoption," and that the "core team and the Status community are

committed to ensuring that the SNT token adds value to the platform and drives network effects."
The whitepaper compared Status to highly successful enterprises such as Facebook and the Line
messaging app, and asserted that it could "design mechanisms for growth that have been tried and
tested . . . ."  As news reports described, Status was designed such that "users of the network will
need to buy SNT from those who already hold it, creating a demand that will in theory raise the
value of the token above the price for which it was first bought—but of course this involves a
degree of speculation, depending on the network being successful beyond just hardcore
cryptocurrency enthusiasts."  Investors in the SNT ICO were therefore "putting a lot of faith in the
Status team's ability to deliver on their promises."  Accordingly, investors in the SNT tokens made
their investment with a reasonable expectation of profits.

### d.    Investors Expected Profits From The SNT Tokens To Be Derived From The Managerial Efforts Of Issuers

77.    The SEC Framework provides that the "inquiry into whether a purchaser is relying
on the efforts of others focuses on two key issues: Does the purchaser reasonably expect to rely on
the efforts of an [Active Participant]?  Are those efforts 'the undeniably significant ones, those
essential managerial efforts which affect the failure or success of the enterprise,' as opposed to
efforts that are more ministerial in nature?"

78.    The SEC explained, further underlining the depth of study the agency had devoted
to the matter over the years and the complexity of such legal analysis from the perspective of a
reasonable investor, that the more of the following characteristics that are present, "the more likely
it is that a purchaser of a digital asset is relying on the 'efforts of others'":

- An ["Active Participant" or "AP"] is responsible for the development, improvement (or enhancement), operation, or promotion of the network, particularly if purchasers of the digital asset expect an AP to be performing or overseeing tasks that are necessary for the network or digital asset to achieve or retain its intended purpose or functionality.

- o Where the network or the digital asset is still in development and the network or digital asset is not fully functional at the time of the offer or sale, purchasers would reasonably expect an AP to further develop the functionality of the network or digital asset (directly or indirectly). This particularly would be the case where an AP promises further developmental efforts in order for the digital asset to attain or grow in value.

- There are essential tasks or responsibilities performed and expected to be performed by an AP, rather than an unaffiliated, dispersed community of network users (commonly known as a "decentralized" network).

- An AP creates or supports a market for, or the price of, the digital asset. This can include, for example, an AP that: (1) controls the creation and issuance of the digital asset; or (2) takes other actions to support a market price of the digital asset, such as by limiting supply or ensuring scarcity, through, for example, buybacks, "burning," or other activities.

- An AP has a lead or central role in the direction of the ongoing development of the network or the digital asset. In particular, an AP plays a lead or central role in deciding governance issues, code updates, or how third parties participate in the validation of transactions that occur with respect to the digital asset.

- An AP has a continuing managerial role in making decisions about or exercising judgment concerning the network or the characteristics or rights the digital asset represents including, for example:

  - o Determining whether and how to compensate persons providing services to the network or to the entity or entities charged with oversight of the network.

  - o Determining whether and where the digital asset will trade. For example, purchasers may reasonably rely on an AP for liquidity, such as where the AP has arranged, or promised to arrange for, the trading of the digital asset on a secondary market or platform.

  - o Determining who will receive additional digital assets and under what conditions.

  - o Making or contributing to managerial level business decisions, such as how to deploy funds raised from sales of the digital asset.

  - o Playing a leading role in the validation or confirmation of transactions on the network, or in some other way having responsibility for the ongoing security of the network.

  - o Making other managerial judgements or decisions that will directly or indirectly impact the success of the network or the value of the digital asset generally.

- Purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset, such as where:

  o The AP has the ability to realize capital appreciation from the value of the digital asset. This can be demonstrated, for example, if the AP retains a stake or interest in the digital asset. In these instances, purchasers would reasonably expect the AP to undertake efforts to promote its own interests and enhance the value of the network or digital asset.

  o The AP distributes the digital asset as compensation to management or the AP's compensation is tied to the price of the digital asset in the secondary market. To the extent these facts are present, the compensated individuals can be expected to take steps to build the value of the digital asset.

  o The AP owns or controls ownership of intellectual property rights of the network or digital asset, directly or indirectly.

  o The AP monetizes the value of the digital asset, especially where the digital asset has limited functionality.

79.    Shifting its focus to the numerous facts bearing on the nature of the digital asset at issue, the SEC explained still further:

Although no one of the following characteristics of use or consumption is necessarily determinative, the stronger their presence, the less likely the *Howey* test is met:

- The distributed ledger network and digital asset are fully developed and operational.

- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.

- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network.  For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.

- Prospects for appreciation in the value of the digital asset are limited.  For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.

- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency.

  o This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.

  o If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.

- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services.  Relevant factors may include:

  o There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.

  o The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

  o An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.

- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.

- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.

- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.

- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

80.     Purchasers of pre-functional tokens, such as SNT, necessarily rely on the managerial efforts of others to realize value from their investments.  The success of these managerial efforts in developing the networks on which these tokens will operate is the primary factor in their price, that is, until such tokens transition into being functional utility tokens.  The SNT token was a security at issuance because profits from SNT would be derived primarily from the managerial efforts of Status in developing the associated network on which SNT would function, rather than having its profit derived from market forces of supply and demand, such as might affect the price of a commodity such as gold (or Bitcoin).

81.     This dependency, however, on the managerial efforts of Status was not apparent at issuance to a reasonable investor.  Considering the limited available information about how SNT was designed and intended to operate, if such an investor were even able to interpret the relevant law at the time, a reasonable investor lacked sufficient bases to conclude whether SNT was a security until the platform at issue, and its relevant "ecosystem," had been given time to develop. In the interim, the investor lacked the facts necessary to conclude—let alone formally allege in court—that the token she had acquired were securities.  It was only after the passage of some significant amount of time, and only with more information about Status's intent, process of management, and lack of success in allowing decentralization to arise, that an investor could reasonably determine that a token that was advertised as something other than a security was a security all along.

82.     Investors' profits in SNT tokens were to be derived from the managerial efforts of others, specifically Status and its co-founders and development teams.  SNT token investors relied on the managerial and entrepreneurial efforts of Status and their executive and development teams to manage and develop the projects funded by the SNT ICO.

83.     Indeed, both Hope's and Bennett's biographies were featured in the Status whitepaper and were held out to be integral parts of the success of SNT.  The whitepaper emphasized that "Carl and Jarrad, the co-founders of Status, have had a working relationship for 6 years on various projects, and 3 of those years were spent operating a software distribution network, driving over 20 million installs to various software offerings, the profits of which were used to fund Status and our team of 10 until this point.  During the operation of this business we were uniquely positioned to see firsthand how personal data on the internet is bought and sold and how users are acquired and retained."

84.     Under this Framework, however complex the resolution of the issue would strike a reasonable investor, SNT satisfies most if not all of the factors the SEC described as relevant to its determination that a digital asset is a security.  Status created SNT tokens from thin air.  Status represented that it would develop an ecosystem (*i.e.*, the overall network of individuals using SNT or participating in the development of its network) that would increase the value of SNT tokens. Plaintiff and the Class reasonably expected Status to provide significant managerial efforts, to develop and improve the SNT ecosystem, to develop and sustain a supportive network, and to secure listings at exchanges through which SNT tokens could be traded or liquidated.  And Status represented that it would provide significant managerial efforts to achieve these objectives and make the issued ERC-20 token a success.

**H.     The SEC Has Concluded That Tokens Such As SNT Are Securities**

85.     On September 30, 2019, the SEC found that another issuer of a similar digital token, Block.one, had violated the Securities Act through its unregistered sale to U.S. investors of a token called EOS.  EOS, like SNT, was a digital token that was not marketed to investors as a security, but—by application of the SEC's Framework—*was* a security in that it constituted an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the

efforts of others.  This enforcement action occurred over two years after Block.one began selling EOS to the public, further underscoring the complexity of these issues for lay investors.

86.     In arriving at its determination that the EOS token is a security, the SEC reached the following conclusions:

- "Companies that offer or sell securities to US investors must comply with the securities laws, irrespective of the industry they operate in or the labels they place on the investment products they offer."

- "Block.one did not provide ICO investors the information they were entitled to as participants in a securities offering."

- "[EOS] Tokens were securities under the federal securities laws"

- "A purchaser in the offering of [EOS] Tokens would have had a reasonable expectation of obtaining a future profit based upon Block.one's efforts, including its development of the EOSIO software and its promotion of the adoption and success of EOSIO and the launch of the anticipated EOSIO blockchains."

- "Block.one violated Sections 5(a) and 5(c) of the Securities Act by offering and selling these securities without having a registration statement filed or in effect with the Commission or qualifying for an exemption from registration."

As a result of the SEC's enforcement action, Block.one consented to a settlement whereby it would pay $24 million to the SEC.  The SEC's recent conclusion—that EOS is a security—applies with equal force to SNT.

**I.     The Class Has Suffered Significant Damages From Defendants' Actions**

87.     As of 10:00 a.m. today, the price of SNT tokens has dropped approximately 97 percent from its 2018 high.  As a direct result of Defendants' issuance, promotion, and sale of unregistered securities, Plaintiff and the Class—many of whom are retail investors who lack the technical and financial sophistication necessary to have evaluated the risks associated with their investments in the SNT token—have suffered significant damages in an amount to be proven at trial.

88.     Hope has admitted that Status has "collectively failed to deliver the SNT use-cases [it] promised" in the whitepaper, and that Status had not reached the point where "people can actually use SNT."   News reports have observed that although Status, at the time, had "98 employees in 24 countries who earn an average salary of $108,000 . . . [t]he Status token has almost no functioning purpose."   To the extent Plaintiff and the Class still hold any SNT tokens, they hereby demand rescission and make any necessary tender of the SNT tokens.

## V.     CLASS ALLEGATIONS

89.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23 and seek certification of the following Class:  all persons who purchased SNT tokens which were first sold on or about June 26, 2017.  The Class Period is thus June 26, 2017 through the present.

90.     The Class excludes individuals subject to any enforceable arbitration clause contained in any of the purchase agreements executed in connection with the SNT ICO.  The Class includes all other individuals who purchased SNT tokens, including those individuals who purchased SNT tokens in sales made through online cryptocurrency exchanges.

91.     Excluded from the Class are Defendants, their officers and directors, and members of their immediate families or their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

92.     Plaintiff reserves the right to amend the Class definition if investigation or discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

93.     The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiff at this time, but it is believed to be in the tens of thousands.

94.     Members of the Class are readily ascertainable and identifiable.  Members of the Class may be identified by publicly accessible blockchain ledger information and records

maintained by Defendants or their agents.  They may be notified of the pendency of this action by electronic mail using a form of notice customarily used in securities class actions.

95.     Plaintiff's claims are typical of the claims of the Class members as all Class members are similarly affected by Defendants' respective wrongful conduct in violation of the laws complained of herein.  Plaintiff does not have any interest that is in conflict with the interests of the members of the Class.

96.     Plaintiff and members of the Class sustained damages from Defendants' common course of unlawful conduct based upon the loss in market value of the SNT tokens.

97.     Plaintiff has fairly and adequately protected, and will continue to fairly and adequately protect, the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests antagonistic to those of the Class.

98.     Common questions and answers of law and fact exist as to all Class members and predominate over any questions solely affecting individual members of the Class, including but not limited to the following:

- Whether SNT is a security under federal and state law;

- Whether Status failed to register SNT as a security under applicable federal and state law;

- Whether Status offered or sold SNT to members of the Class;

- Whether the members of the Class suffered damages as a result of Defendants' conduct in violation of federal and state law; and

- Whether the Class members are entitled to recover the monies they paid thereunder.

99.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by some of the individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.

100.     There will be no difficulty in the management of this action as a class action.

**FIRST CAUSE OF ACTION**
**Unregistered Offer and Sale of Securities**
**Sections 5 and 12(a)(1) of the Securities Act**
**(Status)**

101.     Plaintiff realleges the allegations above.

102.     Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."  15 U.S.C. § 77e(a).

103.     Section 5(c) of the Securities Act states:  "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title."  *Id.* § 77e(c).

104.     When issued, the SNT tokens were securities within the meaning of Section 2(a)(1) of the Securities Act, *Id.* § 77b(a)(1).  Status promoted, solicited or sold purchases of SNT tokens from Plaintiff and members of the Class.  Status thus directly or indirectly made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.  No registration statements have been filed with the SEC or have been in effect with respect to any of the offerings alleged herein.

105.     Section 12(a)(1) of the Securities Act provides in relevant part:  "Any person who offers or sells a security in violation of section 77e of this title . . . shall be liable, subject to subsection (b), to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."  *Id.* § 77*l*(a)(1).

106.     Accordingly, Status has violated Sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77*l*(a)(1).

107.     Plaintiff and the Class seek rescissory damages with respect to purchases of SNT tokens within the last three years and within one year from when an investor could adequately plead that an SNT token is a security.  *Id.* § 77m.

## SECOND CAUSE OF ACTION
**Control Person Liability for Violations of
Sections 5 and 12(a)(1) of the Securities Act
(Jarrad Hope and Carl Bennetts)**

108.    Plaintiff realleges the allegations above.

109.    This Count is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o.

110.    Each of the Individual Defendants, by virtue of his offices, stock ownership, agency, agreements or understandings, and specific acts, at the time of the wrongs alleged herein, and as set forth herein, had the power and authority to direct the management and activities of Status and its employees, and to cause Status to engage in the wrongful conduct complained of herein.  Each Individual Defendant had and exercised the power and influence to cause the unlawful solicitation of purchases of SNT tokens.

111.    The Individual Defendants had and have the power to direct or cause the direction of the management and policies of Status.

112.    The Individual Defendants, separately or together, had sufficient influence to have caused Status to solicit transactions of securities.

113.    The Individual Defendants, separately or together, jointly participated in, and/or aided and abetted, Status's solicitation of securities.

114.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the wrongful conduct complained of herein and are liable to Plaintiff and the Class for rescission and/or damages suffered.

**THIRD CAUSE OF ACTION**
**Unregistered Sale of Securities**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Status)**

115.    Plaintiff realleges the allegations above.

116.    The Illinois Securities Law of 1953 requires securities to be registered prior to their sale in Illinois.  815 Ill. Comp. Stat. Ann. 5/5.  The statute provides that any sale of an unregistered security is "voidable at the election of the purchaser," and "the issuer, controlling person, underwriter, dealer or other person by or on behalf of whom said sale was made, and each underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal is a corporation or unincorporated association or organization, each of its officers and directors (or persons performing similar functions) who shall have participated or aided in making the sale," are jointly and severally liable to each purchaser "for the full amount paid, together with interest from the date of payment for the securities sold at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10 percent per annum) less any income or other amounts received by the purchaser on the securities, upon offer to tender to the seller or tender into court of the securities sold" except that, if the securities were sold, the amount is reduced by "any amounts received by the purchaser for or on account of the disposition of the securities." *Id.* 5/13(A)(1)-(2).

117.    When issued, the SNT tokens were securities within the meaning of 815 Ill. Comp. Stat. Ann. 5/2.1.  Status was the issuer of the SNT tokens sold to Plaintiff and the members of the Class.  The SNT tokens were neither registered as required under the Illinois Securities Law of 1953 nor subject to any exemption from registration.

118.    Sale of the SNT tokens occurred in the State of Illinois.

34

119.    Accordingly, Status, as the issuer of unregistered securities that were sold in Illinois, has violated the Illinois Securities Law of 1953.

120.    Neither Plaintiff nor any Class member has failed, within 15 days from the date of receipt thereof, to accept an offer to repurchase any SNT tokens purchased by them for a price equal to the full amount paid therefor plus interest thereon and less any income thereon.

121.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of this Complaint.  Prior to filing this Complaint, Plaintiff has provided to Status, by certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of their election to rescind, on behalf of himself and the Class, the purchase of any SNT tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id.* 5/13(B).

122.    Plaintiff and Class members who own the SNT tokens seek the full amount paid for any SNT tokens issued by Status in the last three years, together with interest from the date of payment for the SNT tokens at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10 percent per annum) less any income or other amounts received by the purchaser on the securities, together with costs, reasonable attorneys' fees and expenses, and all other remedies available to them.

123.    Plaintiff and Class members who no longer own the SNT tokens seek equivalent rescissory damages for any SNT tokens issued by Status in the last three years, less any amounts

received by the purchaser for or on account of the disposition of such tokens, together with costs,

reasonable attorneys' fees and expenses, and all other remedies available to them.

### FOURTH CAUSE OF ACTION
**Control Person Liability for Unregistered Sale of Securities**
**815 Ill. Comp. Stat. Ann. 5/13**
**(Jarrad Hope and Carl Bennetts)**

124.     Plaintiff realleges the allegations above.

125.     The Illinois Securities Law of 1953 requires securities to be registered prior to their

sale in Illinois.  815 Ill. Comp. Stat. Ann. 5/5.  The statute provides that any sale of an unregistered

security is "voidable at the election of the purchaser," and "the issuer, controlling person,

underwriter, dealer or other person by or on behalf of whom said sale was made, and each

underwriter, dealer, internet portal, or salesperson who shall have participated or aided in any way

in making the sale, and in case the issuer, controlling person, underwriter, dealer, or internet portal

is a corporation or unincorporated association or organization, each of its officers and directors (or

persons performing similar functions) who shall have participated or aided in making the sale,"

are jointly and severally liable to each purchaser "for the full amount paid, together with interest

from the date of payment for the securities sold at the rate of the interest or dividend stipulated in

the securities sold (or if no rate is stipulated, then at the rate of 10 percent per annum) less any

income or other amounts received by the purchaser on the securities, upon offer to tender to the

seller or tender into court of the securities sold" except that, if the securities were sold, the amount

is reduced by "any amounts received by the purchaser for or on account of the disposition of the

securities."  *Id.* 5/13(A)(1)-(2).

126.     When issued, the SNT tokens were securities within the meaning of 815 Ill. Comp.

Stat. Ann. 5/2.1.  Status was the issuer of the SNT tokens sold to Plaintiff and the members of the

Class.  The SNT tokens were neither registered as required under the Illinois Securities Law of 1953 nor subject to any exemption from registration.

127.    Sale of the SNT tokens occurred in the State of Illinois.

128.    Each of the Individual Defendants, by virtue of their offices, stock ownership, agency, agreements or understandings, and specific acts were, at the time of the wrongs alleged herein, controlling persons on behalf of whom the sale of the unregistered tokens issued by Status was made, or officers or directors (or persons performing similar functions) who shall have participated or aided in making the sale of the unregistered tokens issued by Status.

129.    Accordingly, the Individual Defendants, as persons who were controlling persons on behalf of whom the sale of the unregistered tokens issued by Status was made, or officers or directors (or persons performing similar functions) who shall have participated or aided in making the sale of the unregistered tokens issued by Status, have violated the Illinois Securities Law of 1953 through the sale of the unregistered tokens issued by Status.

130.    Neither Plaintiff nor any Class member has failed, within 15 days from the date of receipt thereof, to accept an offer to repurchase any SNT tokens purchased by them for a price equal to the full amount paid therefor plus interest thereon and less any income thereon.

131.    Plaintiff learned that the sale was voidable under Illinois law within six months prior to the filing of this Complaint.  Prior to filing this Complaint, Plaintiff has provided to the Individual Defendants, by certified mail in a properly addressed envelope with adequate postage affixed and deposited in the mail, notice of their election to rescind, on behalf of himself and the Class, the purchase of any SNT tokens they hold, which thereby satisfies the statutory requirement that notice of the election to rescind "shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each

37

person from whom recovery will be sought, by registered mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service." *Id*. 5/13(B).

132.  Plaintiff and Class members who own the SNT tokens seek the full amount paid for any SNT tokens issued by Status in the last three years, together with interest from the date of payment for the SNT tokens at the rate of the interest or dividend stipulated in the securities sold (or if no rate is stipulated, then at the rate of 10 percent per annum) less any income or other amounts received by the purchaser on the securities, together with costs, reasonable attorneys' fees and expenses, and all other remedies available to them.

133.  Plaintiff and Class members who no longer own the SNT tokens seek equivalent rescissory damages for any SNT tokens issued by Status in the last three years, less any amounts received by the purchaser for or on account of the disposition of such tokens, together with costs, reasonable attorneys' fees and expenses, and all other remedies available to them.

## PRAYER FOR RELIEF

134.  On behalf of himself and the Class, Plaintiff requests relief as follows:

(a) That the Court determines that this action may be maintained as a class action, that Plaintiff be named as Class Representative of the Class, that the undersigned be named as Lead Class Counsel of the Class, and direct that notice of this action be given to Class members;

(b) That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the federal and state laws set forth above;

(c) That the Court award Plaintiff and the Class damages in an amount to be determined at trial;

(d) That the Court issue appropriate equitable and any other relief against Defendants to which Plaintiff and the Class are entitled;

(e) That the Court award Plaintiff and the Class pre- and post-judgment interest (including pursuant to statutory rates of interest set under State law);

(f) That the Court award Plaintiff and the Class their reasonable attorneys' fees and costs of suit; and

(g) That the Court award any and all other such relief as the Court may deem just and proper under the circumstances.

## **JURY TRIAL**

135.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff respectfully demands a trial by jury for all claims.

Dated:     April 3, 2020
New York, New York

Respectfully submitted,

/s/ Philippe Z. Selendy                 /s/ Kyle W. Roche
Philippe Z. Selendy                         Kyle W. Roche
Jordan A. Goldstein                         Edward Normand
Spencer Gottlieb                              Velvel (Devin) Freedman (*pro hac pending*)
David Coon                                      Jordana L. Haviv
SELENDY & GAY, PLLC               ROCHE CYRULNIK
1290 Sixth Avenue, 17th Floor          FREEDMAN LLP
New York, NY 10104                       99 Park Avenue, 19th Floor
pselendy@selendygay.com               New York, NY 10016
jgoldstein@selendygay.com             kyle@rcfllp.com
sgottlieb@selendygay.com              tnormand@rcfllp.com
dcoon@selendygay.com                  vel@rcfllp.com
                                                      jhaviv@rcfllp.com

CERTIFICATION OF
SECURITIES CLASS ACTION COMPLAINT

I, Alexander Clifford, hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.     I have reviewed the complaint filed herein (the "Complaint"), and have authorized the filing of a similar complaint and a lead plaintiff motion on my behalf.

2.     I did not purchase the securities at issue in the Complaint at the direction of my counsel or in order to participate in any private action arising under the Securities Act of 1933 (the "Securities Act") or the Securities Exchange Act of 1934 (the "Exchange Act").

3.     I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial, if necessary.

4.     During the Class Period (as defined in the Complaint), I purchased and/or sold the unregistered securities: Status ("SNT")

5.     During the three-year period preceding the date of this Certification, I have not sought to serve as a representative party on behalf of a class in any private action arising under the Securities Act or the Exchange Act.

6.     I will not accept any payment for serving as a representative party on behalf of the Class beyond my *pro rata* share of any possible recovery, except for an award, as ordered by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.

7.     I understand that executing this Certification is not a prerequisite to participation in this Class Action as members of the Class.

_____

Alexander Clifford

Chicago, Illinois